UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| VANESSA MILES, | : | Bankruptcy No. 07-14495DWS |
| | : | |
| Debtor. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, United States Bankruptcy Judge**

Before the Court is the Objection of the debtor Vanessa Miles ("Debtor") to the proof of claim (the "Objection") filed by Countrywide Home Loans, Inc. ("Countrywide"). After a hearing on the Objection, the parties have framed the issues to be resolved by the Court, agreeing that the two legal issues that remain in dispute are (1) whether a claim is available for escrow advances post-entry of a foreclosure judgment and (2) whether Truth-in-Lending Act ("TILA") violations can be charged against Countrywide from the non-disclosure of seller financing in connection with the mortgage loan subsequently assigned to it.[1] In a follow-up conference call, the parties established a schedule to present

---

[1] In an effort to expedite resolution of this long standing litigation between the parties, Countrywide does not insist that Debtor file an adversary proceeding to maintain her affirmative claims under TILA.

stipulated facts[2] and their respective views on the foregoing issues.  As all filings have now been made, the contested matter is ripe for decision.

**BACKGROUND**

Debtor is the owner of residential real estate located at 5423 North Fairhill Street, Philadelphia, PA (the "Residence") which she purchased from Gregory Guzman and Vladimir Korotkin ("Seller") for $54,000 on or about January 31, 2000.  Exhibit B, C and D.  To finance the purchase Debtor contemporaneously executed a Balloon Note in the principal amount of $48,000 payable to Sterling National Mortgage Co., Inc. ("Sterling") which was secured by a mortgage (the "Mortgage") on the Premises (the "Sterling Loan")  Exhibits E and F.  Countrywide's interest arises from an October 3, 2000 assignment from Sterling of the note and Mortgage.  Exhibit G.  Additionally Seller took back three promissory notes in the amount of $1,700, $5,600 and $8,100, respectively.  Exhibits H, I and J.

Because of multiple bankruptcy filings,[3] an Order was entered on consent of the Debtor in her prior Chapter 13 case that should the case be dismissed it would be with a bar on further filing without permission of the Court.  Exhibit P, Doc. Nos. 40, 98.  After the case was dismissed on February 6, 2007, Debtor filed an expedited motion on July 5, 2007

---

[2] While titled "Stipulation of Facts," the pleading is rather a stipulation of documents which are appended thereto.  I will refer to the documents by their exhibit numbers referenced in the Stipulation of Facts.  More significantly, I note that there is no evidence before this Court other than the aforementioned documents upon which I will solely rely in adjudicating this dispute.

[3] After two prior unsuccessful cases, nos. 02-15213 and 03-17000, Debtor's third case, no. 04-11302, was filed on January 30, 2004 and dismissed on August 12, 2004.  Exhibit N.  Case no. 04-34919 was filed on November 8, 2004 and dismissed on February 6, 2007.  Exhibit P.

for leave to file a new case. Id. Doc. No. 105. The hearing on that motion and the sheriff sale scheduled for July 10, 2007 that prompted it were adjourned for approximately thirty days by consent of Countrywide which had entered into negotiations with Debtor concerning the conditions of a new case. Id. Doc. No. 111. On August 6, 2007 the parties entered into a Stipulation Regarding Debtor's Motion for Permission to File a New Bankruptcy Case ("Filing Stipulation") which was approved by the Court on August 7, 2007. Id. Doc. No. 115. Contemporaneously with the filing of the Filing Stipulation, the instant case was initiated.[4]

The Filing Stipulation required the Debtor to remain current on post-petition mortgage payments to Countrywide in an estimated monthly amount of $570.17 and plan payments to the Chapter 13 trustee. The Debtor committed to file a Chapter 13 plan that adequately provided for Countrywide's proof of claim which was anticipated to be approximately $48,000 but reserved the right to review and object to the claim. Exhibit W. While not expressly stated, the parties were implicitly referring to Countrywide's arrearage claim. Remedies upon default were included, including a bar on future filings. On August 7, 2007 the Debtor filed her first Chapter 13 plan which was funded in the amount of $54,000 and provided, inter alia, for payment of Countrywide's arrearage claim as agreed. Exhibit X.[5]

---

[4] The Filing Stipulation was subsequently filed in the new case as well. Exhibit W.

[5] A wage deduction order was entered providing for direct monthly payments of $570.17 to Countrywide and $900 to the Trustee. Exhibit Y.

On April 10, 2008 Countrywide filed a secured proof of claim which set forth an arrearage claim of $46,545.87 and a total claim of $63,838.77. Exhibit Z. On June 24, 2008, Debtor filed a Third Amended Plan which now contemplated paying the entire Countrywide claim as filed as opposed to merely the arrears as provided in the prior plan.[6] Exhibit EE. Under this Plan, Debtor's monthly plan payments increased to $1,430 based on the assumption that, when prior payments were credited, she owed no more than $60,000 to retire the <u>entire</u> indebtedness.

On July 31, 2008 Countrywide filed the amended proof of claim which is the subject of this contested matter. Exhibit A. It asserts a total claim of $91,438.52 based on a current monthly payment of $459.09. Adding interest at 6% in the amount of $15,087.40, the total debt to be provided for in the Plan would be $106,525.92.[7] Debtor's Fourth Amended Plan contemplates an increase in monthly plan payments to $1,875 based on a Countrywide claim

---

[6] In a prior claim objection, the timeliness of the proof of claim was challenged by the Debtor along with other issues that related to the arrears claim. The objections were deemed moot by the parties when Debtor determined to propose a total debt plan. Stipulation Relevant to the Objection to the Proof of Claim Filed by Countrywide and to the Certification of Default of the Filing Stipulation dated July 14, 2008. Doc. No. 89.

[7] Debtor complains that she relied on the prior proof of claim which recited the total amount owed as $63,838.77 as compared to the amount of the present claim of $106,525.92. As the prior claim was an arrears claim, Debtor errs in comparing the debt without interest to the debt with interest over the life of the plan. At the very most, the number jumped from $63,838.77 to $91,438.52, a not unsubstantial increase but one Countrywide contends reflects the change in plan treatment. Debtor's sole remaining objection to the amended proof of claim is to the "escrow advance" component of the claim. In a further effort to reduce the claim, the TILA claim is also advanced.

of not more than $73,000 and interest of 6%. Exhibit FF.[8] It still falls short of the amount necessary to pay the amended proof of claim.

## DISCUSSION

### A. Escrow Advances

Countrywide's claim includes $5,866.22 representing "escrow advances" for reimbursement of post-judgment real estate taxes and insurance premiums. Debtor contends that Countrywide is not entitled to recover this sum because the Mortgage has merged into its judgment and pursuant to the binding authority of In re Stendardo, 991 F.2d 1089 (3d Cir. 1993), the Mortgage which provides the basis of the claim no longer is controlling. Countrywide, however, maintains that "the underlying loan documents, the clear intentions of the parties as well as the doctrines of unjust enrichment and equitable estoppel dictate that it is entirely appropriate for the post-judgment advances to be recovered." Memorandum in Response to Debtor's Objection ("Countrywide Memo') at 2 (unnumbered). I respectfully disagree.

Acknowledging, as it must, the well established Stendardo principle, Countrywide points to the following language which recognizes that a mortgagee is not always precluded from recovering post-judgment charges:

> There is an exception to this doctrine. Parties to a mortgage may rely on a particular provision post-judgment if the mortgage clearly evidences their intent to preserve the effectiveness of the provision post-judgment.

---

[8] A wage order has been entered to transmit this amount to the Trustee but not for the employer to deduct current mortgage payments. Exhibit GG.

-5-

991 F.2d at 1095. This language most commonly is relied upon to support post-judgment mortgage interest and costs where the mortgage expressly imposes a post-judgment obligation on the debtor. Id. (citing cases). While the terms of the Mortgage require the payment of real estate taxes and maintenance of insurance, Countrywide does not point to any language therein that evidences the Debtor's obligation to pay taxes and maintain insurance post-judgment. Rather it argues that the mortgage language that states that the security of the mortgage continues until the note is paid in full is a basis for an exception to the merger doctrine. Countrywide Memo at 3-4 (unnumbered). As support for this proposition, it relies heavily on a 1940 University of Pennsylvania Law Review Note which analyzes Pennsylvania case law from the 1880's to illustrate the author's point that the merger doctrine was intended to prevent duplicity of lawsuits. From this, Countrywide concludes that the merger doctrine is not applicable because it is not intended to prevent a creditor from pursuing a number of chronologically distinct claims or realizing a complete recovery on its cause of action or claim as it seeks to do. Id. at 4.

    I agree with Debtor that these arguments have been considered and rejected in Stendardo and thus are foreclosed from reconsideration here. At issue in Stendardo was the same type of post-judgment charges for taxes and insurance premiums that the mortgagee had paid to protect its security. The Court found no language in the mortgage that clearly obligated the debtor to pay these charges post-judgment and noted that had that been the intention, the document could have easily so provided. It distinguished the case of In re Clark Grind & Polich, Inc., 137 B.R. 172 (Bankr. W.D. Pa. 1992), which the mortgagee had advanced for the proposition that the rights created by the continuing lien of the mortgage

were not extinguished until the creditor received payment by noting that there was specific language in the note and mortgage which provided that recovery of attorneys' fees and cost would survive.  This language, absent in <u>Stendardo</u> and in this case, evidenced the parties' intent that the creditor was entitled to post-judgment compensation.  The Third Circuit was also unpersuaded by the argument, also made by Countrywide, that the intention of the merger doctrine is to prevent repeated litigation of the same claim and thus not implicated where litigation of post-judgment expenses had not occurred.

Finally the Third Circuit addressed the mortgagee's unjust enrichment argument, stating that successful invocation of that theory required the mortgagee to show enrichment to the debtor and an injustice to the creditor if recovery for that enrichment is denied. 991 F.2d at 1099.  It found no enrichment to the debtor. Since the debtors were no longer mortgagors following foreclosure on the mortgage, their obligations had merged into the judgment in foreclosure. Absent a legal obligation for those expenses, the benefit from their payment was incidental.  Moreover, even if the debtors had received a benefit, the Court concluded that the mortgagee could not rely on unjust enrichment for reimbursement because its payment of the expenses protected its own interest so that any benefit to the mortgagor was incidental on this reasoning as well.  <u>Id.</u> at 1100-01.

<u>Stendardo</u> closes the door to reliance on the doctrine of unjust enrichment as an exception to the merger doctrine. Perhaps in recognition of this, Countrywide has briefed its equitable argument only under the rubric of estoppel. It points to the undisputed fact that

Debtor has filed three Chapter 13 cases since the judgment was entered which provided for a cure of arrears and resumption of post-petition payments. Moreover, it entered into the Filing Stipulation agreeing to the new case upon the Debtor's promise to file a Chapter 13 plan that would provide for its presumably arrears claim and make current post-petition mortgage payments. Countrywide argues that it relied on these commitments and continued to advance monies for taxes that the Debtor failed to pay notwithstanding the entry of a foreclosure judgment. Notably Countrywide provided no evidence that it had been induced into making the advances by Debtor's conduct.  An equally plausible explanation for its decision to pay real estate taxes and insurance premiums was a desire to protect its collateral. Moreover, the Debtor's election to propose a plan that would retire the debt instead of reinstate the mortgage was permissible under the Bankruptcy Code and the Filing Stipulation. While that document stated that Debtor was required to file a plan that would provide for Countrywide's anticipated proof of claim in the amount of $48,000, it expressly allowed Debtor the right to review the claim when it was filed and object as appropriate. The Filing Stipulation did not require Debtor to pay the escrow component of its claim if she chose not to reinstate the Mortgage nor require Debtor to file an arrears plan. Moreover, there is no evidence that Countrywide ever considered, let alone discussed with Debtor, the reimbursement of post-judgment advances in the event she filed a full payment plan. In short, I have no way of knowing what Countrywide would have done had it been aware that the Mortgage would not be reinstated through an arrears plan.

Nor does the foregoing factual background support Countrywide's alternative effort to work around <u>Stendardo</u>, i.e., that by proposing to cure prepetition arrearages in this case and prior cases, Debtor has "revived the terms of the note and mortgage." Countrywide Memo at 8 (unnumbered). In support of this argument, Countrywide cites to <u>In re Willets,</u> 196 B.R. 732 (Bankr. W.D. Pa. 1996). <u>Willets</u> accurately states the law as to a debtor's obligation for all mortgage charges where he seeks to reinstate the mortgage by filing a cure plan which was the form of plan elected by the debtor in that case. It does not stand for the proposition that the filing of a plan which contemplates payment of the full debt and not a reinstatement of the mortgage after having previously filed and abandoned a cure plan should be deemed a revival of the terms of the note and mortgage. Indeed revival of the terms of the mortgage post-judgment, a recognized exception to the <u>Stendardo</u> rule, is inconsistent with the intention of a full debt repayment plan which does not seek to reinstate the mortgage.

Finding that <u>Stendardo</u> governs the outcome of this aspect of the contested matter, Debtor's Objection insofar as it challenges the claim for post-judgment taxes and insurance premiums in the amount of $5,866.22 is sustained. As this is the only remaining challenge to the amended proof of claim, the secured claim will be allowed in the amount of $85,752.30 plus interest at 6% over the life of the 60 month plan. However, whether Debtor shall be required to pay that amount will be determined by the outcome of her affirmative claim for damages under TILA which, if granted, would act as an offset. I turn to that issue now.

B.  TILA Claims

The basis of Debtor's recoupment claim is that certain Seller financing evidenced by three notes ("Seller Notes") executed on or about the time of the Sterling transaction were not disclosed on the TILA Disclosure Statement or the Settlement Stipulation.  It is undisputed that these obligations in the amount of $1,700 evidenced by a note dated January 31, 2000, $5,600 evidenced by a note dated January 31, 2000 and $8,100 evidenced by a note dated February 1, 2000 are not reflected on either of these documents.[9]  Exhibits C and D.  There is no evidence that Sterling was notified or aware of the additional financing. Notwithstanding that fact, Debtor claims that the failure to include these supplemental loans on the TILA disclosure documents gives rise to a violation of 15 U.S.C. § 1638(a)(2)(A), (a)(3), (a)(4) and (a)(6) for which statutory and actual damages are to be imposed against Countrywide under 15 U.S.C. § 1640(a)(1).  Debtor contends that by reason of the omission, the "amount financed," the finance charge," the "total of payments," and the number, amount and due dates of payments were inaccurately disclosed.  Debtor's Opening Memorandum of law in Support of Her Objections ("Debtor's Opening Memo") at 6. I concur with Countrywide that Debtor offers no legal authority for holding Countrywide as assignee liable for its assignor's failure to include the three separate loans made by third

---

[9] As Countrywide correctly notes, the two notes dated January 31 do not have the name of the payee inserted in the form although they are signed by Seller.  The February 1 note corrects that omission.  Debtor attributes the financing to Seller and I believe that is a fair assumption although the identity of the lender would only be relevant if it were Sterling or attributable to Sterling which is not the case.

-10-

parties of which it may not even been aware in its TILA disclosures.[10]

TILA § 1638 provides that "[f]or each consumer credit transaction" certain disclosures are mandated. While "consumer credit transaction" is not defined, TILA § 1602 (e) defines "credit" as the "right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." The Sterling Loan was a consumer credit transaction for which disclosure was required. There is no contention that there was any deficiency in the quality or quantity of Sterling's disclosure with respect to the Sterling Loan. Rather Debtor contends that the disclosures were deficient because they did not include other consumer credit transactions, i.e., the Seller Notes. However, that information was not part of the consumer credit transaction for which Sterling had a disclosure obligation since it granted no "credit" to the Debtor to incur that debt and defer its payment. Nor was Sterling a "creditor" with respect to those consumer credit transactions as it was not "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(f)(2).[11]

The frequency with which overextended debtors assert TILA to leverage their position for a restructure of a burdensome mortgage loan suggests that they may be losing

---

[10] While I agree with Countrywide's conclusion, it does not explain how it gets there. Sterling was a creditor as that term is defined in §15 U.S.C. §1602. It no doubt regularly extended consumer credit and was the person to whom the debt at issue in this contested matter was initially payable. I believe Countrywide means that it was not a creditor as to the Seller Notes and was not required to provide disclosures with respect to that financing. While that may seem intuitive, Countrywide does not explain how the statute makes that clear. I will attempt to do so.

[11] As Seller would not be liable under TILA as a creditor by reason of subsection (1) of § 1602(f)("regularly extends consumer credit in more than four installments..."), it is counterintuitive to find that Sterling would have disclosure obligations in connection with the seller financing that the Seller did not have.

sight of TILA's intended legislative purpose. TILA was enacted to promote informed borrowing by requiring disclosures which allow borrowers to understand the true cost and terms of credit so they can effectively choose between its sources. E.g., Brown v. Marquette Sav. and Loan Ass'n, 686 F.2d 608, 612 (7th Cir. 1982); Smith v. Chapman, 614 F.2d 968, 971 (5th Cir. 1980). That is why each consumer credit transaction has its own disclosure requirements, and that is why disclosures must be made before credit is extended. 15 U.S.C. § 1638(c). It furthers no purpose of TILA to include the separate transactions evidenced by the Seller Notes in the Sterling Loan in the TILA Disclosure Statement for the Mortgage Loan. Indeed it would be contrary to the objective of allowing Debtor to compare the terms of the Sterling Loan with other available credit. Nor, assuming that Sterling even knew about the Seller Notes (of which there is no evidence), could Sterling have included that information in its disclosures since the financing was made on the same or the day following the Mortgage Loan.

Because I find no violation of TILA, I need not address the parties' differing views on the damages available for a violation of the statute.[12] The claim for recoupment is denied. Debtor shall amend her Plan consistent with the foregoing Memorandum Opinion.

                              DIANE WEISS SIGMUND
                              United States Bankruptcy Judge

Dated:    October 15, 2008

---

[12] I do note that Countrywide is correct that the 2008 amendment to TILA § 1640(a)(2) is not effective yet. Rather the increase from $2,000 to $4,000 in statutory damages is effective 18 months after its enactment on August 14, 2008.